UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

ANDRE WILSON,

               Plaintiff,

v.                                     Case No. 2:13-cv-22734

C.O. TIM PATTERSON, C.O. JUSTIN CROOK,
PAUL PERRY, Deputy Warden,
JASON COLLINS, Associate Warden,
CHERYL CHANDLER, Assistant Warden,
DAVID BALLARD, Warden,
JIM RUBENSTEIN, Commissioner,
CAPTAIN WILLIAMS and RALPH TERRY,

               Defendants.

## PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and it is referred to the undersigned for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).   Pending before the court is a Motion to Dismiss filed by defendants Williams, Perry, Collins, Chandler, Ballard and Rubenstein (ECF No. 30).   On March 12, 2014, defendant Ralph Terry joined in that Motion to Dismiss.   (ECF No. 39).[1]   The undersigned will refer to these defendants collectively as "the Supervisory Defendants."   Also pending are the plaintiff's Motion for Default Judgment against defendant Tim Patterson (ECF No. 54) and the plaintiff's Motion for Entry of Default (ECF No. 58).

---

[1]   On March 12, 2014, defendants Patterson and Crook filed an Answer to the Amended Complaint (ECF No. 38).

## <u>PLAINTIFF'S ALLEGATIONS AND FACTUAL BACKGROUND</u>

The plaintiff's Amended Complaint (ECF No. 35) arises from an alleged use of force against the plaintiff on July 31, 2013.  The plaintiff alleges that he was sprayed with "pepper spray," and then threatened by correctional officers in retaliation for his filing of prior lawsuits, one of which is also currently pending in this court (Case No. 2:13-cv-20692).

The Amended Complaint specifically alleges that, on July 31, 2013, the plaintiff, who was housed in the Quilliams II segregation unit at the Mount Olive Correctional Complex ("MOCC"), was asleep in his cell when defendants Crook and Patterson came to ask the plaintiff if he wanted to go to recreation (hereinafter "rec").  The plaintiff responded that he did want to go to rec and was told to get ready.   (ECF No. 35 at 10, ¶¶ 13-16).  However, Crook and Patterson never returned to get the plaintiff.  (*Id.*, ¶¶ 19-20).   Thus, the plaintiff pushed his emergency call button several times.   (*Id.*, ¶ 21).  When the plaintiff received no response, several inmates in neighboring cells began to kick their cell doors to garner attention, and the plaintiff ultimately joined in.   (*Id.*, ¶¶ 27-29).

The plaintiff's Complaint further alleges that, eventually, Crook and Patterson came directly to the plaintiff's cell, opened the bean hole and asked him what he wanted.  (*Id.*, ¶¶ 30-36).   The plaintiff maintains that, after Crook and Patterson came into the pod, nobody continued to kick their doors.   (*Id.*, ¶ 31).   The plaintiff asked why he had not been taken to rec, and was told that they had decided to hold him until the first group after lunch.   (*Id.*, ¶ 38).   The plaintiff voiced his displeasure with this decision, at which point, according to the plaintiff, Patterson looked at Crook, who pulled out a "large can of

2

mace" (hereinafter "pepper spray" or "chemical agent") and began to shake it.   (*Id.*, ¶¶ 39-45).   The plaintiff further alleges that he said "what you gonna spray me now, too? Then spray me."   (*Id.*, ¶ 46).   Then, the plaintiff alleges that Crook sprayed him with an excessive amount of pepper spray, said "Now you can sue me too" and then slammed the bean hole shut.   (*Id.*, ¶ 47).   Crook and Patterson then left the pod and the plaintiff was left in his cell for "at least 20 minutes" before he was taken to be decontaminated.   (*Id.*, ¶ 48).   The plaintiff further alleges that either Captain Williams or Paul Perry hosed him down with cold water and told him he should already know he wasn't going to allow the plaintiff to get away with kicking his door.   (*Id.*, ¶ 50).   The plaintiff further alleges that, when he was returned to his cell, it had not been cleaned in accordance with policy, and he was forced to clean it himself and continued to suffer the effects of the chemical agent. (*Id.*, ¶ 51).

The plaintiff further alleges that he was written up for a violation of creating a disturbance and that false incident reports were submitted by Patterson and Crook in an attempt to cover up their unconstitutional conduct.   (*Id.*, ¶ 53).   The plaintiff further alleges that he was not a threat to himself or anyone else because he was behind a locked cell door.   (*Id.*, ¶ 55).

The plaintiff further alleges that Captain Williams, as the supervisor of Patterson and Crook, is "blatantly aware" of the fact that his subordinates do not follow the policy governing the proper use of force and he has done nothing to correct it.   (*Id.*, ¶¶ 56-57). The plaintiff specifically alleges that Williams "encourages the placement of 'Martial Law' and using of pepper spray as punishment for kicking doors and other misbehavior." (*Id.*, ¶ 58).

The plaintiff further alleges that defendants Ballard and Rubenstein have been put on notice of this widespread use of pepper spray in an excessive manner by correctional officers at MOCC through numerous grievances and lawsuits filed by inmates who have been subjected to this conduct.  The plaintiff further alleges that Ballard and Rubenstein have chosen to ignore the issue and have failed to take any action against the offending officers.  (*Id.*, ¶¶ 59-61).  The plaintiff further contends that defendant Ralph Terry, who serves as Acting Warden in Ballard's absence, is also actually aware of this conduct.  (*Id.*, ¶ 62).  The plaintiff further alleges that defendants Ballard and Paul Perry have enforced and encouraged the "Martial Law" policy, allowing officers to "use force for the slightest infraction. . . ."  (*Id.*, ¶¶ 84-85).

The plaintiff further alleges that defendants Chandler, Perry and Collins, as members of the Use of Force Committee, are charged with investigating every use of force at MOCC and are actually aware of and have ignored "the blatant evidence of excessive force," have failed to take any corrective or disciplinary action against the officers involved and, thus, have effectively ratified the malicious and sadistic conduct of their subordinates.  (*Id.*, ¶¶ 63-73).

The plaintiff further alleges that he was sprayed in retaliation for filing prior civil suits in this court against MOCC administrators and correctional officers, one of which resulted in a settlement in his favor.  (*Id.*, ¶¶ 80-82).  The plaintiff has also been permitted to supplement his Complaint to allege that defendant Patterson has engaged in further retaliatory conduct since the filing of the Complaint.  The plaintiff contends that Patterson told the plaintiff he had received his papers and quoted excerpts from the Amended Complaint.  (ECF No. 70 at 1-2).  The plaintiff's Supplemental Complaint

further alleges that, since the filing of his Complaint, defendant Patterson has informed other inmates that the plaintiff is a "rat," and has made statements to other inmates such as, "You, know, I would love to come in there and deal with you, but I would get told on and probably lose my job . . . . I wasn't talking about you, the guy beside you cell 515, he'd tell on me and you know it!!"   (*Id.* at 2-3).

## STANDARD OF REVIEW

The Supervisory Defendants' motion asserts that the plaintiff's Amended Complaint fails to state a claim upon which relief can be granted against them, and should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

In *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007), the Supreme Court observed that a case should be dismissed for failure to state a claim upon which relief can be granted if, viewing the well-pleaded factual allegations in the complaint as true, and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face."   While the complaint need not assert "detailed factual allegations," it must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action."   *Id.* at 555.

The Supreme Court elaborated on its holding in *Twombly* in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a civil rights case.   The Court wrote:

> Two working principles underlie our decision in *Twombly*.   First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.   Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly*, 550 U.S.] at 555, 127 S. Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted).   Rule 8 . . . does not unlock the doors of discovery for a plaintiff

armed with nothing more than conclusions.   Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.   *Id.*, at 556.

* * *

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.   When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

556 U.S. at 678-79.   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct."   *Id.* at 678.

The Supervisory Defendants' motion will be reviewed under Rule 12(b)(6) of the Federal Rules of Civil Procedure and the *Twombly/Iqbal* standard.   Furthermore, as noted recently in *Haley v. Virginia Dep't of Health*, 4:12-cv-0016, 2012 WL 5494306, at *2 n.2 (W.D. Va. Nov. 13, 2012), "[t]he Fourth Circuit has not resolved whether a motion to dismiss based on the Eleventh Amendment is properly considered pursuant to Rule 12(b)(1) or Rule 12(b)(6) . . . The recent trend, however, appears to treat Eleventh Amendment immunity motions under Rule 12(b)(1) [which provides for the dismissal of claims over which the court lacks subject matter jurisdiction]."

## ANALYSIS

The plaintiff's Amended Complaint specifies that he is suing defendants Patterson, Crook, Perry, Collins and Chandler only in their individual capacities, and that he is suing defendants Terry, Ballard, Rubenstein and Williams in both their individual and official capacities.

6

## A.        Official capacity claims.

As addressed in the Supervisory Defendants' Motion and Memorandum of Law, to the extent that the plaintiff has brought claims against some of these defendants in their official capacities, any claims for monetary damages cannot survive because, neither a state, nor its officials acting in their official capacities, are "persons" under the civil rights statutes.   In *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989), the Supreme Court stated:

> Obviously, state officials literally are persons.  But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.   As such, it is no different from a suit against the State itself.   We see no reason to adopt a different rule in the present context, particularly when such a rule would allow petitioner to circumvent congressional intent by a mere pleading device.

> We hold that neither a State nor its officials acting in their official capacities are "persons" under § 1983.   The judgment of the Michigan Supreme Court is affirmed.   [Citations omitted].

Furthermore, pursuant to the Eleventh Amendment to the United States Constitution, the power of the federal judiciary does not extend to suits by a citizen of one state against another, or to suits by a citizen against his or her own state.   *Hans v. Louisiana*, 134 U.S. 1, 9 (1980).   Thus, the Eleventh Amendment of the United States Constitution bars a suit in a federal court by private parties seeking to impose monetary liability upon a State or State officials, which may be paid from public funds in the state treasury.   *Quern v. Jordan*, 440 U.S. 332, 337 (1979).   Absent consent, federal suits against a state by a citizen of that state or another state are prohibited by the Eleventh Amendment.   *Kentucky v. Graham*, 473 U.S. 159, 199 (1985); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 99-100 (1984).   The Eleventh Amendment,

however, permits a federal court to enjoin state officials to conform their future conduct to federal law, which is distinguishable from a retroactive monetary award paid from State funds. *Id.* at 337. Thus, the undersigned proposes that the presiding District Judge **FIND** that the Supervisory Defendants are immune from liability for monetary damages in their official capacities under the Eleventh Amendment. The plaintiff's claims for injunctive relief will be addressed separately *infra*.

**B.    Individual capacity claims.**

The seminal issue in this case is whether the defendants' conduct in using or permitting the use of chemical agents against the plaintiff in his enclosed segregation cell violated the plaintiff's right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment of the United States Constitution. In *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take <u>reasonable</u> measures to guarantee the safety of the inmates.'" [Emphasis added]   This is a low standard.   The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'" *Id.* at 833.

In *Hudson v. McMillan*, 503 U.S. 1 (1992), the Supreme Court held that use of excessive physical force against an inmate may constitute cruel and unusual punishment even when the inmate does not suffer serious injury.   The Court held "that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley [v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain

8

or restore discipline, or maliciously and sadistically to cause harm."   503 U.S. at 6.   The

*Whitley* Court noted that:

> [I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison staff, in addition to the possible harms to inmates against whom force might be used.

475 U.S. at 320.   The Supreme Court has further emphasized that, "prison

administrators . . . should be accorded wide-ranging deference in the adoption and

execution of policies and practices that in their judgment are needed to preserve internal

order and discipline and to maintain institutional security."   *Id.* at 321-22 (quoting *Bell

v. Wolfish*, 441 U.S. at 547).   Thus, the Court stated that "[u]nless it appears that the

evidence viewed in the light most favorable to the plaintiff will support a reliable

inference of wantonness in the infliction of pain, under the standard we have described,

the case should not go to the jury."   *Id.* at 322.

In *Whitley*, the Court set forth the following five factors that must be weighed in

determining whether force was applied in a good faith effort to maintain or restore order,

or whether it was done so maliciously and sadistically for the very purpose of causing

harm:   (1) the need for application of force; (2) the relationship between the need and

the amount of force that was used; (3) the extent of the injury; (4) the threat reasonably

perceived by the responsible official; and (5) any efforts made to temper the severity of a

forceful response.   *Whitley*, 475 U.S. at 321; *Williams v. Benjamin*, 77 F.3d 756, 762 (4th

Cir. 1996).   The United States Court of Appeals for the Fourth Circuit has also held that

verbal provocation alone does not justify use of force.   *Miller v. Leathers*, 913 F.2d 1085,

1089 (4th Cir. 1990) (en banc).   This is clearly-established law of which a reasonable

correctional officer or prison administrator would have known, and is the measure by which the conduct of the officers alleged to have used force against the plaintiff will be judged.

The plaintiff has also asserted that he has been the victim of retaliation for filing lawsuits.  Prisoners enjoy a constitutional right to meaningful access to the courts, and prison officials do not have the power to retaliate against such right.  However, a prisoner asserting a claim of retaliation must show that the alleged retaliatory action deprived him of a constitutional right.  *Hudspeth v. Figgins*, 584 F.2d 1345, 1347 (4th Cir. 1978); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977); *American Civil Liberties Union of Maryland, Inc. v. Wicomico Co., Maryland*, 999 F.2d 780, 785 (4th Cir. 1993).  The defendants' conduct will also be assessed under this clearly-established precedent.

In *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), the Court held that supervisors may be liable for the actions of their subordinates where the supervisor, by his own conduct, was deliberately indifferent to, or tacitly authorized or approved, prior constitutional violations.  Such liability is not based on *respondeat superior*, but rather upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care."  13 F.3d at 798 (*quoting Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984)).  In *Shaw*, the Fourth Circuit discussed the following elements necessary to establish a supervisor's liability under 42 U.S.C. § 1983:

1)      The supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and

> unreasonable risk" of constitutional injury to citizens like the
> plaintiff;
>
> 2)  The supervisor's response to that knowledge was so inadequate
>     as to show "deliberate indifference to or tacit authorization of the
>     alleged offensive practices," and
>
> 3)  There was an "affirmative causal link" between the supervisor's
>     inaction and the particular constitutional injuries suffered by the
>     plaintiff.

13 F.3d at 799.   However, in *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme

Court clarified that a prison official's "actual subjective awareness" of an excessive risk of

harm to the safety of the inmate was required to hold the official liable under the Eighth

Amendment.   Thus, a prison official cannot be held liable for the failure to alleviate a

risk that he should have perceived, but did not in fact perceive.   *Id.* at 838.

<u>*The Supervisory Defendants' Motion to Dismiss*</u>

The Supervisory Defendants' Memorandum of Law contends:

> In [*Farmer v. Brennan*, 511 U.S. 825, 828 (1994)], the United States
> Supreme Court held that prison officials may be liable under the Eighth
> Amendment for denying humane conditions of confinement only if the
> Official "knows that inmates face a substantial risk of serious harm and
> disregards that risk by failing to take reasonable measures to abate it."   *Id.*
> at 847.   The standard for "deliberate indifference" requires actual,
> subjective consciousness of a risk.   *Id.*

(ECF No. 31 at 7).   The Supervisory Defendants emphasize that there is no *respondeat*

*superior* or vicarious liability under section 1983, and that the plaintiff must be able to

affirmatively show that each individual defendant personally acted in a way that violated

the plaintiff's Eighth Amendment rights.   (*Id.* at 7-8).   The Supervisory Defendants

assert that the plaintiff's allegations against them are conclusory in nature and are

insufficient to state a plausible claim as discussed in *Iqbal, supra*.   (*Id.* at 3-4).

11

The Supervisory Defendants' Memorandum of Law further addresses the *Shaw* elements in relation to the plaintiff's case.   The Memorandum of Law asserts that the plaintiff cannot establish that any of these supervisors had actual knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury "by pointing to a single incident or isolated incidence."   (*Id.* at 8-9).   The Supervisory Defendants further assert that, while the second element concerning "deliberate indifference or tacit authorization of the alleged offensive practices" may be demonstrated by "continued inaction in the face of documented widespread abuses," *Shaw*, 13 F.3d at 799, the plaintiff herein has pled only conclusory statements that amount to no more than a recital of the legal elements of a supervisory liability claim.   (*Id.*)   The Memorandum of Law specifically states:

> All the Plaintiff's allegations against these Defendants contained in the Complaint are entirely conclusory and form like recitals of the legal elements of the claim of supervisory liability, without one single supporting fact that can lead this Court to conclude the Plaintiff's claims of supervisory liability are plausible, as opposed to merely "possible."   [*Iqbal*] requires that the Plaintiff demonstrate to some degree, the supporting factual basis upon which the claim for supervisor liability is based.   The allegations in the Complaint do not meet this standard and, therefore, it is proper for this Court to dismiss these Defendants from the above-captioned matter.

(*Id.* at 4).   The Supervisory Defendants further assert that they are entitled to qualified immunity because:

> The only allegations or inactions which allegedly create the basis of liability against Captain Williams, Deputy Warden Perry, Associate Warden Collins, Associate Warden Chandler, Warden Ballard and Commissioner Rubenstein are their failure to properly investigate, train, supervise, and discipline other officers.   All of Plaintiff's claims against these Defendants asserted in his Complaint, therefore, allege deficiencies in the management of subordinates, which is a discretionary administrative function, and which falls under the protection and [sic; of] qualified immunity.

12

(*Id.* at 5).

Government officials are not liable for monetary damages if they can show that their conduct did not violate clearly-established statutory or constitutional rights of which a reasonable person would have known.   *See Wilson v. Layne*, 526 U.S. 603, 609 (1999).   Qualified immunity exists to protect officers in the performance of their duties unless they are "plainly incompetent" or they "knowingly violate the law."   *Doe v. Broderick*, 225 F.3d 440, 446 (4th Cir. 2000).   In ruling on an issue of qualified immunity, a court must consider this threshold question:   "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"   *Saucier v. Katz*, 533 U.S. 194, 201 (2001).   If the allegations do not give rise to a constitutional violation, no further inquiry is necessary. *Id*.   If, on the other hand, a violation can be shown, then the court must determine whether the right was clearly established in the specific context of the case.   *Id.*

However, in *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that courts may decide to address whether the right is clearly established first.   The *Pearson* Court noted that the doctrine of qualified immunity "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."   555 U.S. at 230.

### *The plaintiff's Response to the Motion to Dismiss*

On April 25, 2014, the petitioner filed a Response in Opposition to the Supervisory Defendants' Motion to Dismiss (ECF No. 48).   The plaintiff's Response asserts:

13

[A]ll forementioned defendants (Terry, Williams, Perry, Collins, Chandler, Ballard and Rubenstein) were not only made aware of pernicious use of force against Plaintiff and all other inmates at MOCC but the defendants enacted and enforced an unconstitutional policy and procedure entitled "Martial Law" allowing staff and the Administration to adhere to their own protocall (sic; protocol) and issue punishment without following any policies or procedures thus extripating [sic; extirpating] any and all constitutional rights of all inmates alike including the plaintiff housed in Quilliams unit I and II.

(*Id.* at 3).   The plaintiff's Response further contends:

    As the Plaintiff clearly outlined in his Complaint is that [sic] Defendants (Crook and Patterson) came to the Plaintiff's securely locked cell door, opened the food port slot, became verbally abusive and used copious amounts of chemical agent even though the Plaintiff was no threat to himself, other inmates or the officers.   More importantly, this blatant act of excessive force was enacted and enforced by Defendants which they labled [sic; labeled] "Martial Law" and their own Lieutenant (see Exhibit #1) and in inmate James Mullins' magistrate hearing docket no. MOCC-13-0925-E , Defendant (Patterson) so admits to utilizing and enforcing this unconstitutional policy and procedure . . . Herein, Defendants' own ranking staff members support the Plaintiff's claims thus proving it's "plausible." [Citations omitted].

                                   * * *

Like here in the Plaintiff's case, the repeated uses of force coupled with no investigation into the officers' action in combination with the officers not following policy, but acting on Defendants' "Martial Law" orders, all contributed to the Plaintiff's incident and injuries.   When you factor in the totality of the circumstances and in combination with the variety of risk the Plaintiff was subjected to, it supports a finding of deliberate indifference.

    For example: 1) failure to follow posted orders, policy and procedures which require the Defendants to use "calculated" use of force on inmates who become violent, Defendants knowing the inmate is confrontational should immediately attempt to resolve the problem in a non-confrontational manner, through dialog [sic; dialogue];  2) failed to use and gather information for their assessment of it to assist in determining the need for the use of force;   3) failed to use common sense and good correctional judgment in each situation to determine when there is time for the calculated use of force;   4) failed to investigate into any use of force incidents; and 5) failure to take notice of the voluminous filing of grievances concerning excessive use of force;   6) failed to ensure the

14

Plaintiff's safety when a hazardous, potentially dangerous situation was obvious. Similarly, courts are more likely to find crowding unconstitutional if it occurs in combination with long lock-in times or contributes to other dangerous conditions.

(*Id.* at 6-7, 9-10).

The plaintiff's Response contends that the conduct of the Supervisory Defendants meets both the objective and subjective standard for deliberate indifference to the safety of inmates. He asserts that "[t]he continuing excessive use of force and the potential risk to inmates and the plaintiff being sprayed with chemical agents were obvious to the Defendants and there is no doubt that the Defendants knew about them." (*Id.* at 12). The plaintiff contends that

It is nearly an everyday occurrence that 1-3 inmates at a minimum get hosed down with chemical agents while securely locked in their assigned cells within the Quilliams unit. That is clear evidence that the risk was obvious and the Defendants had actual knowledge. Defendants (Ballard, Williams, Terry, Rubenstein, Chandler, Collins and Perry) also had actual knowledge of the potential risk to Plaintiff's health and safety as demonstrated by the Plaintiff's submitted exhibits.

(*Id.* at 13).

The plaintiff further contends that "the *Farmer* standard 'is not designed to give officials the motivation to 'take refuge' in the zone between ignorance and actual knowledge.'" (quoting *Mayoral v. Sheahan*, 245 F.3d 934, 940 (7th Cir. 2000)). (*Id.* at 14). His Response further states:

It is also important to mention that, even after these Defendants were aware of multiple incidents, [concerning inmates] who were hosed down with chemical agents while securely locked in their cells, causing the Plaintiff's two new incidents, these Defendants continued to be deliberately indifferent and turn a blind eye as a countless amount of inmates have been abused and continue to be abused leaving potential risk to inmates' health and safety for failing to take action.

(*Id.*)

In support of his claims, the plaintiff has presented evidence that he contends demonstrates six separate incidents of excessive use of force resulting from the defendants' "Martial Law" policy.   (*Id.* at 15-17 and Exs. 1-5).   The plaintiff asserts that "deliberate indifference may be shown by 'a series of incidents closely related in time' or 'by procedures [that] make suffering and injury inevitable . . . ."   *Villante v. Dept. of Corr. Of City of New York*, 786 F.2d 516, 519 (2d Cir. 1986); *Gilland v. Owens* 718 F. Supp. 667, 687 (W. D. Tenn. 1989).   (*Id.*)   The plaintiff alleges that each of the incidents addressed in his Response, and countless other unspecified incidents of correctional officers spraying segregated inmates who were securely locked in their cells and posing no threat to anyone, demonstrate a consistent pattern of deliberate indifference to inmate safety in violation of the Eighth Amendment.   The plaintiff asserts that he will be able to demonstrate such a pattern following discovery.   (*Id.* at 16-17).

The plaintiff's Response further asserts that these Supervisory Defendants are not entitled to qualified immunity because they repeatedly ignored or condoned obvious constitutional violations and "purposefully subjected the Plaintiff to an excessive use of force condition. . . ."   (*Id.* at 17-19).   The plaintiff further asserts that:

> Defendants were under notice of the condition and risk to the Plaintiff's health and safety, and aware of the fact guards blatantly used chemical agents for no justifiable reason or for minor infractions existed [sic] and its risk and did nothing.   The failure to train or investigate complaints and grievances over a period of (3) years all support a finding of supervisory liability and are governed by the deliberate indifference standard.   Even if they were not actually involved in the events that are the basis of the Plaintiff's constitutional claims, supervisory officials can be personally involved in the constitutional torts of their subordinates.

16

* * *

   Defendants are responsible for ensuring that their facilities are free from harm once being advised and/or being placed on notice of the hazardous condition and the Defendants negligently appointed, trained and supervised their employees and failed to enforce rules, post orders and policies that instructed staff on how and when use of force is applied, and to address letters, grievances and complaints about excessive force under their care and authority.  Supervisors may be held liable for constitutional violations of their subordinates.  Such "liability is not premised upon respondeat superior, but upon a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be the causative factor in the constitutional injuries they inflict on those committed to their care.  Plaintiff contends that the facts set forth in his case establishes [sic; establish] supervisory liability.

(*Id.* at 20-22).

### *The Supervisory Defendants' Reply*

The Supervisory Defendants' Reply asserts that the plaintiff has admitted that he and other inmates were kicking their doors, which is "a security risk and a threat to safety as inmates have been known to kick the doors off of their hinges and Plaintiff is aware of this."  (ECF No. 52 at 2-3).  The Supervisory Defendants' Reply further asserts that the officers involved "used calculated force in this instance and efforts were made to temper their response."  (*Id.* at 3).  Specifically, the Supervisory Defendants assert that the plaintiff was "sprayed with a chemical agent rather than more forceful measures such as prodding Plaintiff with a Taser or blasting him with a beanbag from a shotgun."  (*Id.*)  The Reply further asserts that "in the Defendant officers' judgment, the fastest way to stop Plaintiff from posing this threat was to spray him with a chemical agent."  (*Id.*)

The Supervisory Defendants also re-assert that they are entitled to qualified immunity because their alleged conduct constituted "deficiencies in the management of

subordinates, which is a discretionary administrative function, and which falls under the protection and [sic; of] qualified immunity." (*Id.*)   The Reply further states:

> Further, Plaintiff claims that officials ignored complaints, not that they failed to review the complaints.   A prison official who reviews a use of force complaint and then decides not to act on it because there was no cause for concern that the use of force was improper is exactly the type of discretionary decision to which qualified immunity applies.

(*Id.*)

The plaintiff contends that his allegations that the failure of these defendants in their administrative and supervisory roles to take action to curb widespread use of pepper spray on inmates in the Quilliams II unit amounts to tacit authorization of an excessive use of force and should be sufficient to stand-up to legal scrutiny under *Iqbal*. The plaintiff's Amended Complaint specifically alleges that defendants Ballard and Perry have established and enforced a "Martial Law" policy, in which correctional officers at MOCC are permitted to "use force for the slightest infraction, even arguing after being told to shut up by an officer." (ECF No. 35 at 21).   The plaintiff's Amended Complaint further alleges that defendants Rubenstein, Ballard, Perry, Collins, Chandler, Williams and Terry have failed to take disciplinary or other action to curb these widespread uses of excessive force, and related retaliation, of which they are actually aware, due to their roles either on the Use of Force Committee, which directly reviews each use of force, or as supervisors and administrators who review grievances and appeals.   The plaintiff has asserted that he will develop and prove specific instances of deliberate indifference by the Supervisory Defendants in the discovery process.

In *Shaw,* the Fourth Circuit held that "liability is ultimately determined by pinpointing the person/persons in the decision making chain whose deliberate

18

indifference permitted the constitutional abuses to continue unchecked." 13 F.3d at

799. The undersigned has also found a discussion by the United States Court of Appeals

for the Tenth Circuit to be particularly instructive concerning the conduct for which

supervisors may be held liable for allegedly unconstitutional conduct in the wake of

*Iqbal*. In *Dodds v. Richardson*, the court found as follows:

> § 1983 allows a plaintiff to impose liability upon a defendant-supervisor
> who creates, promulgates, implements, or in some other way possesses
> responsibility for the continued operation of a policy, the enforcement (by
> the defendant-supervisor or her subordinates) of which "subjects, or
> causes to be subjected," that plaintiff "to the deprivation of any rights . . .
> secured by the Constitution . . ." [citation omitted]; *see also Davis v. City of
> Aurora*, 705 F.Supp.2d 1243, 1263–64 (D. Colo. 2010) ("The exercise of
> control which may create the "affirmative link" does not need to be the sort
> of on-the-ground, moment-to-moment control that defendants appear to
> suggest. Rather, the establishment or utilization of an unconstitutional
> policy or custom can serve as the supervisor's "affirmative link" to the
> constitutional violation.... [W]here an official with policymaking authority
> creates, actively endorses, or implements a policy which is constitutionally
> infirm, that official may face personal liability for the violations which
> result from the policy's application."). A plaintiff may therefore succeed in
> a § 1983 suit against a defendant-supervisor by demonstrating: (1) the
> defendant promulgated, created, implemented or possessed responsibility
> for the continued operation of a policy that (2) caused the complained of
> constitutional harm, and (3) acted with the state of mind required to
> establish the alleged constitutional deprivation. [Footnote omitted]. *See
> Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002) ("Under
> 42 U.S.C. § 1983, Summum must establish (1) a violation of rights
> protected by the federal Constitution or created by federal statute or
> regulation, (2) proximately caused (3) by the conduct of a person (4) who
> acted under color of any statute, ordinance, regulation, custom[,] or usage,
> of any State or Territory or the District of Columbia." (internal quotations
> and citations omitted)). Denying qualified immunity on the basis of such a
> showing complies with *Iqbal*'s requirement that § 1983 liability only be
> imposed upon those defendants whose own individual actions cause a
> constitutional deprivation because it requires plaintiffs prove each
> defendant took some act with the constitutionally applicable state of mind
> that caused the alleged constitutional violation.

614 F.3d 1185, 1199-1200 (10th Cir. 2010).

Taking the plaintiff's allegations as true, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff has alleged specific facts that would allow the court to draw a reasonable inference that the conduct of each of these Supervisory Defendants violated the plaintiff's constitutional rights through the promulgation, implementation and/or continued enforcement of a policy or procedure that exposes inmates to excessive and unnecessary uses of force, when such use of force was not justified under the circumstances, was for malicious or sadistic purposes, rather than simply to restore order, and constituted "wantonness in the infliction of pain."   The plaintiff has also sufficiently alleged that the actions of the defendants were motivated, at least in part, by retaliation for the plaintiff's exercise of his right to access the courts.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff's Amended Complaint states plausible claims of violations of his rights under the First and Eighth Amendments of the United States Constitution, and that his allegations further sufficiently support claims of supervisory liability against defendants Rubenstein, Ballard, Perry, Chandler, Collins, Williams and Terry.   Furthermore, the undersigned proposes that the presiding District Judge **FIND** that, based upon these allegations, it is premature to make a finding of whether these Supervisory Defendants are entitled to qualified immunity, and that the parties should be permitted to engage in discovery and further proceedings on these matters.

### D.    The plaintiff's requests for injunctive relief.

In his Amended Complaint, the plaintiff seeks injunctive relief in the form of a transfer from the administrative segregation unit to the general population of the prison, with the restoration of all rights and privileges, as well as the removal from the plaintiff's

20

prison record of allegedly fraudulent disciplinary reports related to this incident.   (ECF No. 35 at 31).   The Supervisory Defendants' Memorandum of Law in support of their Motion to Dismiss asserts that, to the extent that the plaintiff is seeking a preliminary injunction or temporary restraining order ("TRO"), such relief should not be granted because the plaintiff cannot successfully meet the standard necessary to obtain such relief.   (ECF No. 10-11).

Rule 65(b) of the Federal Rules of Civil Procedure permits the issuance of a TRO, without notice to the adverse party, only if "specific facts in an affidavit or a verified complaint clearly show that the immediate and irreparable injury, loss or damage will result to the movant before the adverse party can be heard in opposition."   Fed. R. Civ. P. 65(b).   Rule 65(a) provides that a court may issue a preliminary injunction only on notice to the adverse party.   Fed. R. Civ. P. 65(a).   The remainder of the rule addresses the procedure for a hearing on motions for a preliminary injunction and the scope of any such injunction.   *Id.*

In 2009, the United States Court of Appeals for the Fourth Circuit revisited the applicable standard of review for preliminary injunctions in the case of *The Real Truth About Obama*, 575 F.3d 342 (4th Cir. 2009) (hereinafter "*Real Truth*")[2], in light of the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed.2d 249 (2008).   As noted by the *Real Truth* Court:

> A preliminary injunction is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief *pendente lite* of the type available after the trial.   *See In re Microsoft Corp. Antitrust*

---

[2]   Although the original decision in *Real Truth* was vacated by the Supreme Court for further consideration in light of the decision in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), the Fourth Circuit reissued its opinion on Parts I and II of its earlier opinion in the case.   *See* 575 F.3d at 345-347.

*Litig.*, 333 F.3d 517, 524-26 (4th Cir. 2003); *see also De Beers Consol. Mines, Ltd. V. United States*, 325 U.S. 212, 220-21, 65 S. Ct. 1130, 80 L. Ed. 1566 (1945).  Because a preliminary injunction affords, on a temporary basis, the relief that can be granted permanently after trial, the party seeking the preliminary injunction must demonstrate by "a clear showing" that, among other things, it is likely to succeed on the merits at trial. *Winter*, 129 S. Ct. at 376; *see also Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed.2d 162 (1997)(per curiam). * * *

In its recent opinion in *Winter*, the Supreme Court articulated clearly what must be shown to obtain a preliminary injunction, stating that the plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter*, 129 S. Ct. at 374.  And all four requirements must be satisfied.  *Id.*  Indeed, the Court in *Winter* rejected a standard that allowed the plaintiff to demonstrate only a "possibility" of irreparable harm because that standard was "inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.* at 375-76.

575 F.3d 345-46.

The *Real Truth* decision emphasizes that "the *Winter* requirement that the plaintiff clearly demonstrate that [he] will likely succeed on the merits is far stricter than the [*Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir. 1977)] requirement that the plaintiff demonstrate only a grave or serious *question* for litigation."  *Id.* at 346-47.  The *Real Truth* further distinguishes the *Winter* standard from the old *Blackwelder* standard because it no longer requires the court to balance the irreparable harm to the respective parties, but rather requires the plaintiff to make a clear showing that he is likely to be irreparably harmed, and that the court must pay particular attention to the public consequences in employing the extraordinary remedy of an injunction.   The Court again emphasized that <u>all four</u> factors must be met in order to justify this extraordinary relief.  *Id.* at 347.  The Court stated that the

standard articulated in *Winter* would henceforth govern the issuance of preliminary injunctions in all federal courts.  *Id.*

As noted in the Supervisory Defendants' Memorandum of Law:

"A preliminary injunction is an order, entered before a final determination on the merits of a lawsuit, that is specifically designed to 'protect the status quo and to prevent irreparable harm during the pendency of [the] lawsuit." *Ward v. Plymale*, 2013 U.S. Lexis 99854, *5 (S.D. W. Va. June 14, 2013).

\* \* \*

First, Plaintiff's claims for a preliminary injunction or temporary restraining order should be denied because Plaintiff is not seeking to protect the status quo, but rather to change the conditions of his confinement. *See Sosa v. Lantz*, 660 F. Supp.2d 283 (2009 DC Conn). Plaintiff is simply trying to change where he is housed in prison and eliminate disciplinary records.

Second, Plaintiff's claims for a preliminary injunction or temporary restraining order do not demonstrate that there is a likelihood of irreparable harm to the Plaintiff. "To justify preliminary relief, plaintiff must demonstrate that injury is certain, great, actual and not theoretical . . . . Allegations of what is likely to occur are of no value since court must decide whether harm in fact will occur." *Tanner v. Fed. Bureau of Prisons*, 433 F. Supp.2d 117, 125 (D.D.C. 2006). Plaintiff has not demonstrated the risk of any injury let alone an actual injury. Plaintiff's Complaint contains scant relevant facts, and Plaintiff has not indicated the nature of harm he expects to suffer if the injunction is not issued.

Third, Plaintiff has failed to demonstrate that the likelihood of irreparable harm to the Plaintiff outweighs the likelihood of irreparable harm to the Defendants should Plaintiff's injunction be issued. While Plaintiff's harm if the injunction is denied is at best theoretical, Defendants' harm should the injunction be granted is real and would be pervasive. Plaintiff seeks to remove [or] circumvent the normal procedures for housing an inmate. Inmates are placed in segregation housing based upon the prediction that they will present an immediate risk to other inmates and prison staff if placed in general population. Plaintiff's injunction would completely undermine this process and would result in a high level of danger to the Officer's safety, inmate safety, and prison staff safety.

23

> Therefore, because the plaintiff's request would not protect the status quo, and because the likelihood of irreparable harm to the Defendants outweighs the theoretical likelihood of irreparable harm to the Plaintiff, to the extent that Plaintiff has done so, any request for a preliminary injunction or temporary restraining order should be denied.

(ECF No. 31 at 10-11).

The plaintiff did not address his claims for injunctive relief in his Response.   The undersigned does not believe that the plaintiff has specifically sought <u>preliminary</u> injunctive relief.   Nevertheless, it does not appear that the plaintiff can establish that immediate or irreparable harm will result if the requested injunctive relief is not granted. The plaintiff cannot be granted prospective injunctive relief based solely upon past conduct, and the plaintiff has not made specific allegations of potential future violations of his constitutional rights that rise above the speculative level.   Thus, he has not made a clear showing that he is likely to be irreparably harmed.

Moreover, a prisoner has no constitutional right to be housed in a particular facility or unit, *see Meachum v. Farno*, 427 U.S. 215, 223-24 (1976), and to order the release of the plaintiff from administrative segregation and place him in the general population with full restoration of rights and privileges would require consideration of matters such as the "location, variations of daily routines, changes in conditions of confinement and the denial of privileges," which are largely left to the broad discretion and judgment of prison administrators, rather than the intervention of a federal court. The same is true for the plaintiff's request to have certain disciplinary records removed from his prison record, which is also within the province of the prison administration.

As noted by the United States Court of Appeals for the Fourth Circuit in *Taylor v. Freeman*:

> [S]weeping intervention in the management of state prisons is rarely appropriate when exercising the equitable powers of the federal courts. This is true where conditions at the prison have been adjudged unconstitutional following trial on the merits.   It is especially true where mandatory injunctive relief is sought and only preliminary findings as to the plaintiff's likelihood of success on the merits have been made.

34 F.3d 266, 269 (4th Cir. 1994).

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff has not sufficiently demonstrated a real and immediate threat of harm and the injunctive relief sought by the plaintiff is not proper for judicial consideration. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the plaintiff's requests for injunctive relief, either on a preliminary or permanent basis, should be denied.

### E.   The plaintiff's Motions for Entry of Default and Default Judgment Against Defendant Tim Patterson.

On March 13, 2014, the plaintiff filed a Motion for Leave to Supplement Complaint (ECF No. 40), with a Supplemental Complaint attached.   In the Supplemental Complaint, the plaintiff sought to add allegations that defendant Tim Patterson has engaged in retaliatory conduct against the plaintiff since the time of the filing of the instant lawsuit.

On April 17, 2014, the undersigned ordered the defendants to respond to the plaintiff's Motion for Leave to Supplement his Complaint by April 28, 2014.   The defendants failed to file any response to the Motion for Leave, which the undersigned construed as an indication that the defendants did not oppose the supplementation of the plaintiff's Amended Complaint with the allegations of continued retaliation by defendant Patterson.   Nevertheless, the court did not actually grant the plaintiff's

25

Motion for Leave to File his Supplemental Complaint until December 31, 2014.

On May 29, 2014, the plaintiff filed a Motion for Entry of Default (ECF No. 58) and a Motion for Default Judgment (ECF No. 54), claiming that defendant Patterson had failed to answer or otherwise defend against the allegations in the Supplemental Complaint.   Therefore, the plaintiff requested the entry of default and a default judgment against defendant Patterson in the amount of $75,000.

On May 30, 2014, defendant Patterson filed a Response in Opposition to the plaintiff's Motion for Default Judgment, stating that, to the extent that he could be considered to be in default, the court is justified in setting aside such default because his failure to respond was not done in bad faith and the plaintiff has suffered no prejudice therefrom.   (ECF No. 59).   Defendant Patterson also attached his Response to the allegations in the Supplemental Complaint.   (*Id.*, Ex. A).   In the Order granting the Supplemental Complaint (ECF No. 69), which was entered on December 31, 2014, the undersigned directed that the Supplemental Complaint and Response be docketed as new docket entries, *nunc pro tunc* to the date each was filed, and they are now docketed as ECF Nos. 70 and 71.

At the time that the plaintiff's motions were filed, defendant Patterson had no duty to respond to the Supplemental Complaint, as leave to file the same had not yet been granted and, thus, the court does not consider defendant Patterson to be in default. The court has subsequently granted the plaintiff leave to supplement his Complaint and defendant Patterson has filed his Response/Answer thereto.   Accordingly, the undersigned proposes that the presiding District Judge **FIND** that defendant Patterson was not in default and there is no basis for the entry of a default judgment against him.

## RECOMMENDATION

Based upon the proposed findings contained herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the Motion to Dismiss filed by defendants Jim Rubenstein, David Ballard, Jason Collins, Paul Parry and Cheryl Chandler and Captain Williams (ECF No. 30) and defendant Ralph Terry's Motion to Dismiss (ECF No. 39) with respect to the plaintiff's claims against these defendants in their official capacities, and as to the plaintiff's claims for injunctive relief, but **DENY** the Motions to Dismiss (ECF Nos. 30 and 39) with respect to the plaintiff's claims for monetary damages against those defendants in their individual capacities.   It is further respectfully **RECOMMENDED** that the presiding District Judge **DENY** the plaintiff's Motion for Default Judgment against defendant Tim Patterson (ECF No. 54) and the plaintiff's Motion for Entry of Default (ECF No. 58).

It is further respectfully **RECOMMENDED** that the presiding District Judge leave this matter referred to the undersigned Magistrate Judge for additional proceedings concerning the plaintiff's remaining claims.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge.   Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such

objection.   Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.   *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).   Copies of such objections shall be provided to the opposing parties and Judge Johnston.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to the plaintiff and to transmit a copy to counsel of record.

January 8, 2015

Dwane L. Tinsley
United States Magistrate Judge