## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON

**ANDRE WILSON,**

      **Plaintiff,**

**v.**                                                    **Case No. 2:13-cv-22734**

**C.O. TIM PATTERSON, C.O. JUSTIN CROOK,**
 **and CAPTAIN WILLIAMS,**

      **Defendants.**

### PROPOSED FINDINGS AND RECOMMENDATION

Pending before the court is the defendants' Motion for Summary Judgment (ECF No. 78).  This matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and it is referred to the undersigned for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

### PLAINTIFF'S ALLEGATIONS AND FACTUAL BACKGROUND

The plaintiff's Amended Complaint (ECF No. 35) arises from an alleged use of force against the plaintiff on July 31, 2013.  The plaintiff alleges that he was sprayed with "pepper spray," and then threatened by correctional officers in retaliation for his filing of prior lawsuits, one of which is also currently pending in this court (Case No. 2:13-cv-20692).

The Amended Complaint specifically alleges that, on July 31, 2013, the plaintiff, who was then housed in the Quilliams II segregation unit at the Mount Olive Correctional Complex ("MOCC"), was asleep in his cell when defendants Crook and Patterson came to ask the plaintiff if he wanted to go to recreation (hereinafter "rec").

The plaintiff responded that he did want to go to rec and was told to get ready. (ECF No. 35 at 10, ¶¶ 13-16). However, Crook and Patterson never returned to get the plaintiff. (*Id.*, ¶¶ 19-20). Thus, the plaintiff pushed his emergency call button several times. (*Id.*, ¶ 21). When the plaintiff received no response, several inmates in neighboring cells began to kick their cell doors to garner attention, and the plaintiff ultimately joined in. (*Id.*, ¶¶ 27-29).

The plaintiff's Complaint further alleges that, eventually, Crook and Patterson came directly to the plaintiff's cell, opened the bean hole and asked him what he wanted. (*Id.*, ¶¶ 30-36). The plaintiff maintains that, after Crook and Patterson came into the pod, nobody continued to kick their doors. (*Id.*, ¶ 31). The plaintiff asked why he had not been taken to rec, and was told that they had decided to hold him until the first group after lunch. (*Id.*, ¶ 38). The plaintiff voiced his displeasure with this decision, at which point, according to the plaintiff, Patterson looked at Crook, who pulled out a "large can of mace" (hereinafter "pepper spray" or "chemical agent") and began to shake it. (*Id.*, ¶¶ 39-45). The plaintiff further alleges that he said "what you gonna spray me now, too? Then spray me." (*Id.*, ¶ 46). Then, the plaintiff alleges that Crook sprayed him with an excessive amount of pepper spray, said "Now you can sue me too" and then slammed the bean hole shut. (*Id.*, ¶ 47). Crook and Patterson then left the pod and the plaintiff was left in his cell for "at least 20 minutes" before he was taken to be decontaminated. (*Id.*, ¶ 48). The plaintiff further alleges that either Captain Williams or Paul Perry hosed him down with cold water and told him he should already know he wasn't going to allow the plaintiff to get away with kicking his door. (*Id.*, ¶ 50). The plaintiff further alleges that, when he was returned to his cell, it had not been cleaned in accordance with policy, and he was forced to clean it himself and continued to suffer the

2

effects of the chemical agent. (*Id.*, ¶ 51).

The plaintiff further alleges that he was written up for a violation of creating a disturbance and that false incident reports were submitted by Patterson and Crook in an attempt to cover up their unconstitutional conduct. (*Id.*, ¶ 53). The plaintiff further alleges that he was not a threat to himself or anyone else because he was behind a locked cell door. (*Id.*, ¶ 55).

The plaintiff further alleges that Captain Williams, as the supervisor of Patterson and Crook, is "blatantly aware" of the fact that his subordinates do not follow the policy governing the proper use of force and he has done nothing to correct it. (*Id.*, ¶¶ 56-57). The plaintiff specifically alleges that Williams "encourages the placement of 'Martial Law' and using of pepper spray as punishment for kicking doors and other misbehavior." (*Id.*, ¶ 58).

On February 24, 2015, the defendants filed a Motion for Summary Judgment (ECF No. 78) and a Memorandum of Law in support thereof (ECF No. 79). Pursuant to the holding in *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of his right and obligation to file a response to any such motion. (ECF No. 92). By that time, the plaintiff had already filed a Response to the Motion for Summary Judgment (ECF No. 84 and 85), which included affidavits, declarations and other exhibits, but he was granted leave to file any supplemental response adding additional evidence or arguments by May 15, 2015. (ECF No. 92). No supplemental response was filed. On May 28, 2015, the defendants filed a Reply (ECF No. 127).[1]

---

[1]   The defendants' Reply asserts that pages 21-29 of the plaintiff's Response should be stricken as exceeding the 20-page limit set forth in Local Rule 7.1 of the Local Rules for the United States District Court for the Southern District of West Virginia. However, because the plaintiff's Response addresses multiple claims against multiple defendants and because the plaintiff is proceeding pro se, the

## STANDARD OF REVIEW

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a) (2010). Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Id.* The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991).

Rule 56(c)(1) of the Federal Rules of Civil Procedure provides that:

> A party asserting that a fact cannot be or is genuinely disputed, must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

---

undersigned believes that the court should grant the plaintiff leave to exceed the page limit. Accordingly, the defendants' request to strike pages 21-29 of the plaintiff's Response should be denied.

> (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  Subsection (e) of Rule 56 provides that, if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the court may:  (1) give the parties an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and undisputed supporting materials show that the movant is entitled to it; or (4) issue any other appropriate order.  Fed. R. Civ. P. 56(e).

A court must not resolve disputed facts, weigh the evidence, or make determinations of credibility.  *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  However, the party opposing the motion may not rely upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  *Sprenkle v. Hartford Life Ins. Co.*, 84 F. Supp. 2d 751 (N.D. W. Va. 2000).

## ANALYSIS

### A. The plaintiff's Eighth Amendment claims against defendants Patterson and Crook fail as a matter of law.

The plaintiff's Amended Complaint alleges that defendant Crook's deployment of pepper spray against the plaintiff on July 31, 2013 was an excessive use of force in violation of the Eighth Amendment. The Amended Complaint further alleges that defendant Patterson is also liable under the Eighth Amendment because he failed to intervene in this "unjustified attack" upon the plaintiff.

In *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" This is a low standard. The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'" *Id.* at 833. The Supreme Court, however, rejected an argument that an objective test of deliberate indifference be established.

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. Thus, to sustain an Eighth Amendment claim, a prisoner must show two things: (1) "the deprivation must be, objectively, 'sufficiently serious;'" that is, "denial of 'the minimal civilized measure of life's necessities;'" and (2) the prison official had a "'sufficiently culpable state of mind;'" that is, "'deliberate indifference' to inmate

health or safety." *Id.* at 834. (Citations omitted.)   The negligent failure to protect inmates from violence will not suffice. *Pressly*, 816 F.2d at 979.

In *Hudson v. McMillan*, 503 U.S. 1 (1992), the Supreme Court held that use of excessive physical force against an inmate may constitute cruel and unusual punishment even when the inmate does not suffer serious injury.  The Court held "that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley* [*v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  503 U.S. at 6.   The majority opinion noted that "[t]he objective component of an Eighth Amendment claim is therefore contextual and responsive to 'contemporary standards of decency.'" 503 U.S. at 8. [Citation omitted.]

> In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.   [Citation omitted.] This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.   Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today. * * *
>
> That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. [Citation omitted.]   The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "repugnant to the conscience of mankind." [Citations omitted.]

*Id.*, at 9-10.   Near the conclusion of the *Hudson* opinion, Justice O'Connor wrote: "To deny, as the dissent does, the difference between punching a prisoner in the face and serving him unappetizing food is to ignore the 'concepts of dignity, civilized standards, humanity and decency' that animate the Eighth Amendment."   *Id.*, at 11.

The *Whitley* case involved a riot at the Oregon State Penitentiary where a prison officer was taken hostage.  In an attempt to free the hostage, a plan was put in place for an unarmed prison security manager to enter the cell block where the hostage was being held, followed by prison officers armed with shotguns.  The security manager ordered one of the armed officers to fire a warning shot and to shoot low at any inmates found climbing the stairs in the direction of the security manager.  During this rescue attempt, one of the officers shot an inmate in the left knee.  The inmate filed suit in federal court, and at the conclusion of a jury trial, the District Court directed a verdict for the defendants.  The Court of Appeals subsequently reversed that ruling and remanded the case to the District Court for a new trial.  The Supreme Court granted certiorari, and ultimately found no Eighth Amendment violation.

The *Whitley* Court noted that:

[I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison staff, in addition to the possible harms to inmates against whom force might be used.

475 U.S. at 320.  The Supreme Court has further emphasized that, "prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Id.* at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. at 547).  Thus, the Court stated that "[u]nless it appears that the evidence viewed in the light most favorable to the plaintiff will support a reliable inference of wantonness in the infliction of pain, under the standard we have described, the case should not go to the jury."  *Id.* at 322.

The defendants' Motion for Summary Judgment (ECF No. 78) and Memorandum of Law in support thereof (ECF No. 79) assert that the use of pepper spray against the plaintiff on July 31, 2013 was a reasonable amount of force under the circumstances, and was done in a good faith effort to restore order in the prison unit.  Accordingly, the defendants assert that the plaintiff cannot successfully establish that defendants Patterson and Crook violated his Eighth Amendment rights.   The defendants' Memorandum of Law states:

> The infliction of pain in the course of a prison security measure does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable and hence unnecessary in the strict sense. [*Whitley*, 475 U.S. at 319].  "Prison officials do not violate the U.S. Const. Amend VIII whenever it appears in retrospect that the infliction of pain during a security measure could theoretically have been avoided." *Id.* at 319.  The U.S. Supreme Court has found that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."  *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed.2d 156 (1992).

(ECF No. 79 at 10).

The defendants' Memorandum of Law identifies and discusses five factors set forth in *Whitley* that must be weighed in determining whether force was applied in a good faith effort to maintain or restore order, or whether it was done so maliciously and sadistically for the very purpose of causing harm.  (*Id.*)  The five factors identified by the Supreme Court to be used in making this determination are:  (1) the need for application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury; (4) the threat reasonably perceived by the responsible official; and (5) any efforts made to temper the severity of a forceful response.  *Whitley*, 475 U.S. at 321; *Williams v. Benjamin*, 77 F.3d 756, 762 (4th Cir. 1996).  (*Id.*)  The

defendants' Memorandum of Law addresses the constitutionality of the deployment of pepper spray against the plaintiff on July 31, 2013 under these factors.

As justification for the need for the use of force against the plaintiff, the defendants' Memorandum of Law largely focuses on the plaintiff's violent institutional history, which consists of at least 36 rules violations, including 13 assaults, and the circumstances on the plaintiff's unit at the time of this incident.[2]  (ECF No. 79 at 1-3).  The defendants' Memorandum of Law quotes from the plaintiff's description of this incident given in his deposition.  The defendants state that, after acknowledging that he began kicking his door to get the officers' attention, the following occurred:

> And then Patterson and Crook come in the pod, walk past my buddy's cell that was kicking first, came to my cell and said, "What's your fucking problem, boy?"  I said, "You woke me up for rec.  What's going on?"  I said "Why did you wake me up if you wasn't going to take me to rec?"  "Well first off, Wilson, I woke you up because I fucking wanted to."
>
> He said something that was disrespectful, and me and him got into it.  I cannot remember the exact words right now.  Something – what – "Fuck you." And I said "Fuck you."  It was disrespectful both ways.  Then he said something like, "Now you ain't getting your fucking rec." "Man, I don't care, just get away from my cell."  "Well" – "and you're getting wrote up, too."  I said, "Look, I'm on punitive.  Fuck you and a write-up, please get away from my cell."
>
> And he's over there hiding behind Patterson shaking his big -- the big can of spray up.  And I said, "What?  You gonna fucking spray me now, too? Spray me then," and he sprayed me.

(ECF No. 78, Ex. A at 47-48; ECF No. 79 at 4).  The defendants' Memorandum of Law notes that, as a result of this incident, the plaintiff received two write-ups and was found guilty of both offenses, as acknowledged by the plaintiff in his deposition.  (ECF No. 79 at 5).  The defendants further contend that, via a grievance filed after this incident, the

---

[2]   During his deposition, the plaintiff was questioned extensively about and acknowledged his lengthy record of violent institutional infractions.  (ECF No. 79, Ex. A).

plaintiff acknowledged that this use of force was reviewed by the Shift Commander, the Use of Force Review Committee and the Warden and was not found to be excessive.  (*Id.* at 5; ECF No. 78, Ex. C).

In addition to the plaintiff's deposition testimony and his grievance, the defendants have offered Incident Reports completed by defendants Patterson and Crook, and Officer Chris Wilson, who was working in the Tower at the time of this incident (ECF No. 78, Exs. D-F). and a videotape of the decontamination process after the plaintiff was pepper sprayed (ECF No. 78, Ex. G).  However, the undersigned notes that there is no audio or video evidence of the use of force itself.

Tower Officer Wilson's Incident Report indicates that the plaintiff was kicking his door hard enough to activate the door position security (DPS) light, in violation of Policy Directive 325.00 Rule Number 1.10, Tampering With Locks/Doors.  (ECF No. 78, Ex. F). The Incident Reports prepared by Officers Patterson and Crook state that they were notified by Tower Officer Wilson that the plaintiff was kicking his door and they went to investigate.  Both reports indicate that when the officers entered the pod, the plaintiff was still kicking his door.  (ECF No. 78, Exs. D and E).  Both reports further indicate that, when the officers approached his cell, the plaintiff stated "Why didn't you take me to rec you whores!" and began to kick his door again.  (*Id.*)   Both reports further indicate that Officer Patterson lowered the food tray slot and attempted to "perform efforts to temper."  (*Id.*)  Both reports further states that the plaintiff "began to escalate his aggressive behavior and started screaming 'if you are going to spray me then spray me you fucking bitch!' and proceeded to kick the door another time."  (*Id.*)

Although not directly addressed in Officer Crook's Incident Report, the Incident Report of Officer Patterson further states:

At that time COII Crook then deployed two, one second bursts from personal carry Mark-9.  I then exited the pod along with COII Crook to inform COI Chris Wilson to call medical because I/M was contaminated with OC.  At approximately 0828 hours Licensed Practical Nurse Allen Basham arrived in unit to perform decontamination.  At approximately 0834 hours I/M was escorted to Multipurpose room by myself and COII Crook for decontamination.  At approximately 0846 hours I/M was placed in the top shower for further decontamination while COII and I decontaminated I/M Wilson cell.  At approximately 0859 hours I/M Wilson was placed back in his assigned cell without further incident.  End of Report.

(ECF No. 78, Ex. E).

The defendants' Memorandum of Law addresses the first *Whitley* factor in relation to the plaintiff's case as follows:

> With regard to the first part of the test, it is clear that there was a highly volatile situation in the Quilliams units as Plaintiff and other inmates were kicking their doors and causing unrest within the unit.  The Plaintiff himself testified that numerous inmates were kicking their doors and causing a disturbance.  The Plaintiff concedes that he was arguing with Officer Crook and Officer Patterson.  In fact, the Plaintiff not only concedes that he was arguing, but also admits that he stood at his cell door and attempted to continue arguing with the Correctional Officers.
>
> The need for the use of OC is clear.  Plaintiff, an inmate convicted of a violent crime and with a long history of violent offenses within the WVDOC, was housed in the segregation unit of a maximum security prison.  Not only did the Plaintiff's actions of kicking his door contribute to the disturbance in the Pod, it prevented these Correctional Officers from carrying out their then pressing duties of keeping other inmates safe and secure.
>
> In the instant matter, the Plaintiff concedes he was kicking his door, being disrespectful towards officers, and arguing with officers.  Despite Officer Patterson and Officer Crook's alternate attempts to temper, Plaintiff continued to cause a disturbance and pull the Correctional Officers away from the duty at hand and contributed to the general disturbance in the Pod.

(*Id.* at 10-11).

Turning to the second factor, the defendants assert that "it is clear that Officer Patterson and Officer Crook only used that force which was reasonably necessary to obtain Plaintiff's compliance." (*Id.* at 11). Their Memorandum further states:

> In the instant matter, the situation at hand was simply not a single inmate refusing an order. Rather, by the Plaintiff's own testimony, there was general unrest in the Pod because the plaintiff was not taken to rec. The Plaintiff, despite the unrest in the Pod, refused to stop yelling, stop kicking his door and stop arguing and being disrespectful towards officer Patterson and Officer Crook.

(*Id.* at 12). The defendants' Memorandum quotes the Fourth Circuit's decision in *Williams v. Benjamin*, as follows:

> [M]ace can be constitutionally used in small quantities to "prevent riots and escapes" or **to control a recalcitrant inmate**." *Landman v. Peyton*, 370 F.2d 135, 138 & n.2 (4th Cir. 1966), cert. denied, 388 U.S. 920, 18 L. Ed.2d 1367, 87 S. Ct. 2142 (1967). *See also Bailey*, 736 F.2d at 968-69. ***A limited application of mace may be "much more humane and effective than a flesh to flesh confrontation with an inmate."*** *Soto [v. Dickey]*, 744 F.2d [1260] at 1262 [7th Cir. 1984]. Moreover, prompt washing of the maced area of the body will usually provide immediate relief from pain. *Id.* Furthermore, because a limited use of mace constitutes a relatively "mild" response compared to other forms of force, the initial application of mace indicates a "tempered" response by the prison officials.

77 F.3d 756, 763 (4th Cir. 1996) (emphasis added). (ECF No. 79 at 11-12).

The defendants assert that the plaintiff cannot produce any objective evidence to support the third factor concerning the extent of any injury related to the alleged use of force. Although the plaintiff complained of temporary irritations and possible swelling, the defendants assert that he did not require any medical treatment and had no lasting injury.[3] (*Id.* at 12). The defendants' Memorandum of Law further asserts that, as evidenced by the videotape of the decontamination process, the plaintiff was asked if he

---

[3] The court notes, however, that, in *Wilkins v. Gaddy*, 559 U.S. 34 (2010), the Supreme Court clarified that an absence of serious injury is but one factor to consider in the analysis of whether force was used in a good faith effort to maintain or restore discipline or maliciously and sadistically to cause harm.

felt better or if he was still burning from the OC, and he stated, *inter alia*, "My neck and ears are a little hot, but I'll get over it" and "Yeah, I'll be alright though."  (ECF No. 79 at 6-7, citing to ECF No. 78, Ex. G at *14:15* and *15:11*).

Concerning the fourth factor, the defendants assert that the defendants reasonably perceived the plaintiff's conduct as a threat to the order and security of the prison because the plaintiff created a disturbance and refused an order in a volatile environment.  (*Id.*)

Finally, with regard to the fifth factor to be weighed, the defendants claim that Corp. Hudson "tempered his response."  (*Id.*)  The defendants contend that:

> In accordance with the Use of Force Model, Corp. Hudson could have employed a tazer [sic; Taser], a pepper ball or could have employed a bean bag round fired from a shotgun.  Despite the more invasive, painful and extreme measures available, Capt. McCloud chose to exercise the least amount of force by deploying, in accordance with policy, two (2) one-second bursts of OC.

(*Id.*)

In sum, the defendants assert that a proper weighing of these factors supports a finding that Crook's deployment of pepper spray into the plaintiff's segregation cell was done in a good faith effort to maintain or restore discipline and order and not maliciously or sadistically for the very purpose of causing harm.   (*Id.* at 11-12).  Accordingly, the defendants assert that there is no genuine issue of material fact, and they are entitled to judgment as a matter of law on the plaintiff's Eighth Amendment claims.

The defendants' Memorandum of Law further argues that the plaintiff cannot demonstrate the violation of any clearly-established constitutional right based upon the discretionary decisions of the defendants.  As noted in the defendants' Memorandum:

Federal authority on qualified immunity establishes that "[g]overnment officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."" *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998). "[G]eneral functions as a correctional officer, like most law enforcement officers, are broadly characterized as discretionary, requiring the use of his discretionary judgments and decisions." *Cochran v. W. Va. Reg'l Jail & Corr. Facility Auth.*, 2014 U.S. Dist. LEXIS 89893, *15-16 (S.D. W. Va. July 2, 2014) (*quoting West Virginia Regional Jail and Correctional Facility Authority v. A.B.*, No. 13-0037, 2014 W. Va. LEXIS 253, section III(A)(5) (Mar. 27, 2014).

In the instant action, it is clear that Officer Patterson, Officer Crook, and Captain Williams acted in accordance with the controlling WVDOC Policy, Policy Directive 312.02, and the Use of Force Model, on each occasion that Plaintiff was sprayed with two (2) one-second bursts of OC. Additionally, it is clear that Officer Crook sprayed the Plaintiff for the purpose of restoring order and controlling an unruly and recalcitrant inmate.

(ECF No. 79 at 13-14). Thus, the defendants assert that they are entitled to qualified immunity on the plaintiff's claims. (*Id.*)

The plaintiff's Response to the Motion for Summary Judgment largely repeats the factual allegations made in his Complaint surrounding this incident. He specifically asserts that when the officers entered the pod, "all kicking of the doors stopped." (ECF No. 85 at 6). He further disputes the veracity of the defendants' Incident Reports. (*Id.*) His Response further states:

However, the Defendants tell a much different story. They claim that once they entered the pod the Plaintiff became hostile and belligerent with them, still continued to kick his door, they performed efforts to temper and the Plaintiff only escalated his aggressive behavior. The Defendants offer no testimony, no sworn affidavits, only their self-serving statements in clear contradiction. They argue there was no assault, no retaliation of any kind and the plaintiff was written up for his behavior.

(*Id.* at 9).

15

The plaintiff maintains that the decision in *Hudson* "has provided more than fair warning to all defendants that to employ pepper spray as punishment, or for the sadistic pleasure of the sprayers, as distinguished from what is reasonably necessary to maintain prisoner control is constitutionally prohibited." (*Id.* at 10). His Response emphasizes:

> Not every instance of inmate resistance justifies the use of pepper spray and it should not be justified every time an inmate questions orders or seeks redress for an officer's actions. No lasting injury is necessary to make out an 8th Amendment violation, for the infliction of pain is sufficient and it was sufficient if it was inflicted for the purpose of causing harm and the law was clearly established that these officers did not have a blank check to use force . . . whenever a prisoner was being difficult . . . chemical agents are dangerous, inflict pain and can cause permanent injury and even death, they are corporal punishment and absent clear and present danger of riotous proportions can never be justified when used against individual prisoners in their cells. *Landman v. Royster*, 333 F. Supp. 621 (E.D. Va. 1971).

(*Id.* at 11-12).

The plaintiff further asserts that neither defendant gave him any direct commands or warnings; thus, he contends that they never attempted to get his compliance. (*Id.* at 13). He notes that none of the incident reports or the violation report for "creating a disturbance" even mention that the plaintiff was given a direct order to stop yelling, stop kicking, stop arguing or stop being disrespectful. (*Id.* at 14). He repeatedly reiterates that no one was kicking their doors at that time, and that the other inmates who were kicking their doors were not pepper sprayed. He has offered other inmate affidavits or declarations describing the incident. (ECF No. 85, Exs. A-C). Thus, the plaintiff contends that no force was necessary. (*Id.* at 15-16). For all of these reasons, the plaintiff asserts that there are genuine issues of material fact about whether this use of force was reasonable under the circumstances, and that the defendants' Motion for Summary Judgment should be denied.

The defendants' Reply reiterates their argument that the use of force by Crook in this case was proper under *Whitley v. Albers*, *supra*. (ECF No. 93 at 2-6). The defendants further assert that the plaintiff has improperly attempted to limit the application of the Supreme Court's analysis in *Whitley* to instances involving a prison riot. (*Id.* at 2-3). The defendants further assert that the plaintiff's reliance on the Fourth Circuit's decision in *Landman* is misplaced and that the language quoted by the plaintiff does not appear in that opinion. (*Id.* at 2). The defendants' Reply further asserts:

> Important to the case at bar is the United States Supreme Court's holding that "where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 320-21 (internal quotations omitted).

(*Id.* at 3). The defendants further emphasize the follow statement of the Supreme Court in *Whitley*:

> When the "ever-present potential for violent confrontation and conflagration," *Jones v. North Carolina Prisoners' Labor Union, Inc.* 433 U.S. 119, 132 (1977), ripens into *actual* unrest and conflict, the admonition that "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators," *Rhodes v. Chapman*, *supra*, at 349 n.14, carries a special weight. "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain internal security." *Bell v. Wolfish*, 441 U.S. at 547. That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.

475 U.S. at 321-22.  (ECF No. 93 at 3).

The defendants' Reply further states:

C.O. Crook and C.O. Patterson determined that Plaintiff's actions in creating a disturbance was significant enough to warrant further action from the officers.  It is nonsensical for Plaintiff to refer to his conduct as non-threatening in light of the significant risks or hazards that Plaintiff's conduct posed to jail officers, to Plaintiff and to others.  Plaintiff admits as much in his Response by stating that other inmates continued to cause a disturbance based on Plaintiff's actions.  (*See* ECF No. 85, p. 12).  * * *

Plaintiff keeps relying on his statement and statements in his affidavits that he did not kick the doors or ask anyone to kick the doors for him.  (*See* ECF No. 85, p. 12).  In hindsight, whether Plaintiff started the door kicking or asked inmates to kick their doors is inconsequential.  The fact remains, that several inmates began kicking their doors because Plaintiff was not allowed to go to rec.  From C.O. Crook and C.O. Patterson's vantage point, Plaintiff instigated the conduct and confirmed as much when he continued to argue with them.  Plaintiff's other argument is that the force was unnecessary because all of the inmates stopped kicking the doors when the C.O.s entered the pod.  (*Id.* at p. 13).  Again, Plaintiff's disrespectful and argumentative behavior towards C.O. Crook and C.O. Patterson in combination with Plaintiff's extensive past history of violence, caused reason for the officers to believe that the force used was necessary to prevent further escalation and further endangerment.  In this case, and in retrospect, the possibility that C.O. Crook and C.O. Patterson could have avoided the use of OC by resorting to other methods or techniques to gain Plaintiff's compliance is not a violation of the Eighth Amendment.

(ECF No. 93 at 5-6).

Applying the *Whitley* factors to the undisputed facts of this case viewed in the light most favorable to the plaintiff, the undersigned proposes that the presiding District Judge **FIND** that the force used against the plaintiff by defendant Crook on July 31, 2013 was used in a good faith effort to restore order, and not maliciously or sadistically for the purpose of causing harm.  Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that there are no genuine issues of material fact and

that defendant Crook is entitled to qualified immunity and judgment as a matter of law on the plaintiff's Eighth Amendment claims.

Furthermore, because the undersigned has proposed that the presiding District Judge find that Crook's conduct did not violate the plaintiff's Eighth Amendment rights, the undersigned further proposes that the presiding District Judge **FIND** that there also is no basis for Eighth Amendment liability against defendant Patterson.  Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that there are no genuine issues of material fact and that defendant Patterson is entitled to qualified immunity and judgment as a matter of law on the plaintiff's Eighth Amendment claim against him.

### B. The plaintiff's First Amendment retaliation claims against defendants Patterson and Crook also fail as a matter of law.

The plaintiff's Amended Complaint further alleges that, by assaulting him with pepper spray and subsequently filing false disciplinary reports against him, defendants Crook and Patterson acted in retaliation for prior litigation instituted by the plaintiff against various West Virginia Division of Corrections personnel, in violation of his First Amendment right to access the courts and petition the Government for redress of grievances.  In support of this assertion, the plaintiff alleges that, when defendant Crook deployed the pepper spray against the plaintiff in his cell, he stated "Now you can sue me too." (ECF No. 35 at 13, ¶ 47).  The Amended Complaint further states:

> 80. The retaliation claims stem from a number of grievances and civil suits the plaintiff filed against this administration and several officers working the Quilliams unit for excessive force among other things.

> 81. In 2012 the plaintiff did settle a civil suit against this administration in the Southern District Court of West Virginia for excessive force, under Mary Stanley and Honorable Judge Joseph Goodwin.

19

82. On or around June 15, 2013, the plaintiff did file another civil suit Case # 2:13-cv-20692 in the Southern District of West Virginia, again for excessive force and other matters.

(*Id.* at 20-21, ¶¶ 80-82).

On March 13, 2014, the plaintiff filed a Supplemental Complaint, which was granted by leave of court on December 21, 2014, which contains additional allegations concerning the plaintiff's retaliation claim. The Supplemental Complaint, which is docketed as ECF No. 70, alleges that, since the filing of the Complaint in the instant matter, defendant Patterson has been "openly retaliatory" to the plaintiff. (ECF No. 70 at 2, ¶ 3). Specifically, the plaintiff alleges that:

4. On the date of Wednesday, February 26th, 2014, Tim Patterson did stop by my cell, specifically Cell 515 in the Quilliams II unit. Defendant Patterson did say to me, "I received your legal pack the other day you know?"

5. I simply replied "Oh yeah?"

6. Patterson then went on to quote several lines from the Complaint, grinned at me and walked off down the tier.

7. On Thursday, February 27th, 2014, Defendant Patterson did get into a heated argument with another inmate, one Lawrence Stuckey, who resides in Cell 514 in Quilliams II, right beside of the plaintiff.

8. During this argument Patterson became blatantly disrespectful with inmate Stuckey therefore Stuckey became quite belligerent with Defendant Patterson and began telling him to "come in his cell and talk that tough shit."

9. Defendant Patterson did reply to inmate Stuckey "You know, I would love to come in there and deal with you, but I would get told on and probably lose my job."

10. Inmate Stuckey then replied "I'm not gonna say shit, I'm not a rat, I got 2 life sentences bitch, Quit making excuses and come on in here."

11. Defendant Patterson went on to say "I wasn't talking about you, the guy beside you, Cell 515, he'd tell on me and you know it!!"

12. Inmate Stuckey did continue on with his rant towards Tim Patterson.

13. I did receive several "kites" or letters from several inmates on the pod asking me about being a rat, asking me what Patterson was talking about, [etc., etc.]

14. The plaintiff has exhausted all administrative remedies.

(ECF No. 70 at 2-3). The plaintiff alleges that this additional conduct by defendant Patterson was in retaliation for the plaintiff's protected conduct of filing previous legal actions and, thus, violated the plaintiff's First Amendment rights. (*Id.* at 3). The plaintiff attached several hand-written "kites" to his Supplemental Complaint. (*Id.*, Ex. 1).

The defendants' Memorandum of Law asserts that the plaintiff cannot succeed with his retaliation claim because the spraying of the plaintiff with OC and the filing of disciplinary reports against him were done for legitimate, non-retaliatory reasons. Their Memorandum of Law further states:

> Retaliation claims made by inmates are treated "with skepticism because every act of discipline by prison officials is by definition retaliatory in the sense that it responds directly to prisoner misconduct." *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (internal quotations omitted). As this court has held, "[t]o prevail upon a claim of retaliation, the inmate must specifically demonstrate that but for his protected conduct she would not have been subjected to the alleged retaliatory act. *See Huang v. Board of Governors of Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990). Essentially, the inmate must first demonstrate that she engaged in protected conduct and second that her protected conduct motivated the retaliatory act." *Powers v. Fed. Bureau of Prisons*, 2012 U.S. Dist. LEXIS 101698, *58-59 [2012 WL 2998510, * 17] (S.D. W. Va. May 23, 2012). "A First Amendment retaliation claim contains three essential elements; thus, to defeat a motion for summary judgment, Smith must establish that: (1) his speech was protected; (2) the defendants' alleged retaliatory action adversely affected his constitutionally protected speech; and (3) a causal relationship exists between his speech the [sic] his speech and the

defendants' retaliatory action."  *Smith v. Berlin*, 2014 U.S. Dist. LEXIS 139725, *39 (S.D. W. Va. Aug. 28, 2014).[4]

(ECF No. 79 at 17).

The defendants' Memorandum of Law reiterates that the conduct of defendant Crook with regard to deploying pepper spray against the plaintiff in his cell on July 31, 2013 was warranted under the circumstances and, thus, the defendants argue that the plaintiff cannot demonstrate that such conduct was in retaliation for the plaintiff's prior litigation activity.  Their Memorandum of Law further states that:

> Even assuming Officer Crook told Plaintiff "now you can fucking sue me, too," [FN 1 – Defendants deny that Officer Crook made such a statement.] after he sprayed Plaintiff with two (2) one-second bursts of OC, Plaintiff cannot prove that he was sprayed with OC for the purpose of retaliating against Plaintiff's First Amendment right. * * * Like in *Powers*, where the Court found no retaliation because there were legitimate, nonretaliatory reasons for the examination; here, Plaintiff was sprayed with OC by Officer Crook in an attempt to control an unruly and disruptive inmate, not for retaliation against Plaintiff for filing lawsuits.  Further, corrections officers had reason to file disciplinary reports against Plaintiff as his creation of a disturbance violated prison policy, and he violated prison policy by tampering with doors and locks by kicking his door.

(ECF No. 79 at 18).

The defendants' Memorandum of Law further asserts that the plaintiff cannot successfully state a retaliation claim against Captain Williams.  (*Id.*)  However, the plaintiff's Response clarifies that he is not pursuing a retaliation claim against defendant Williams.  (ECF No. 85 at 19).  Thus, no further discussion of such a claim is necessary.

---

[4] The undersigned located a slip copy of the Honorable Robert C. Chambers' opinion entered on September 30, 2014 in *Smith v. Berlin*, 2014 WL 4929468 (S.D. W. Va. Sept. 30, 2014).  In this opinion, Chief Judge Chambers notes that a Proposed Findings and Recommendation (PF&R) submitted by United States Magistrate Judge Cheryl A. Eifert on August 28, 2014 was amended the following day, August 29, 2014, in light of the Fourth Circuit's decision in *Booker v. South Carolina Dept. of Corrections*, No. 13-2014 WL 4244253 (4th Cir. Aug. 28, 2014).  Judge Eifert's Amended PF&R recommended that Smith's First Amendment retaliation claim be permitted to proceed to trial in light of the decision in *Booker*.  Chief Judge Chambers adopted that finding and recommendation in his September 30, 2014.

The plaintiff's Response repeats many of the factual allegations contained in his Amended Complaint, which will not be discussed again in detail herein.  However, the plaintiff's Response further asserts that he has provided sworn statements from other inmates in the pod who were kicking their doors at the same time as the plaintiff who were not written up or in any way disciplined or pepper sprayed for their conduct that day.  (ECF No. 85 at 24 and Exs. B and C).  Thus, the plaintiff asserts that an assault with pepper spray and his receipt of allegedly false disciplinary violations, as well as defendant Patterson's subsequent labeling of the plaintiff as a "rat, snitch or informant" are "actions that the courts have found to be sufficiently adverse to support a retaliation claim." (*Id.* at 25).  The plaintiff also alleges, for the first time, that the defendants made racially derogatory comments about the plaintiff after the pepper spray incident.  (*Id.* at 25-26).  The plaintiff has attached an additional sworn statement from another inmate supporting these contentions.  (ECF No. 85, Ex. H).

The defendants' Reply addresses the plaintiff's retaliation claims as follows:

> Plaintiff argues his retaliation claims are proven by C.O. Crook's alleged statements "Now you can sue me too," "that black motherfucker likes to run his mouth.  I showed him that niggers need to know their place around here," and C.O. Patterson's alleged statements to another inmate that Plaintiff would tell on C.O. Patterson for dealing with another inmate. (*See* ECF No. 85, pp. 24, 28).  While there is no argument that Plaintiff's speech in filing grievances, complaining about force used against him, and filing lawsuits is protected, Plaintiff's argument fails in that [sic; he has not shown that?] C.O. Crook and C.O. Patterson's alleged retaliatory action adversely affected Plaintiff's constitutionally protected speech and that a causal relationship exists between the [sic] his speech and the defendants' retaliatory action.  Plaintiff was sprayed with OC by Officer Crook in an attempt to control an unruly and disruptive inmate, not for retaliation against Plaintiff for filing of lawsuits.  Furthermore, corrections officers had reason to file disciplinary reports against Plaintiff as his creation of a disturbance violated prison policy, and he violated prison policy by tampering with doors and locks by kicking his door.

(ECF No. 93 at 10).

Prisoner retaliation claims are treated "with skepticism because every act of discipline by prison officials is by definition retaliatory in the sense that it responds directly to prisoner misconduct." *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (internal quotations omitted).  In fact, this court has held:

> To prevail upon a claim of retaliation, the inmate must specifically demonstrate that but for his protected conduct she would not have been subjected to the alleged retaliatory act.  *See Huang v. Board of Governors of Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990).  Essentially, the inmate must first demonstrate that she engaged in protected conduct and second that her protected conduct motivated the retaliatory act.

*Powers v. Fed. Bureau of Prisons*, 2012 U.S. Dist. LEXIS 101698, *58-59 [2012 WL 2998510, *17] (S.D. W. Va. May 23, 2012).  A First Amendment retaliation claim contains three essential elements.  The inmate must demonstrate that: (1) his speech was protected; (2) the defendants' alleged retaliatory action adversely affected his constitutionally protected speech; and (3) a causal relationship exists between his speech the [sic] his speech and the defendants' retaliatory action." *Smith v. Berlin*, 2014 U.S. Dist. LEXIS 139725, *39 (S.D. W. Va. Aug. 28, 2014).[5]

The Fourth Circuit recently addressed First Amendment retaliation claims in *McFadden v. Lewis*, 517 F. App'x 149, 150 (4th Cir. Apr. 2, 2013) (unpublished) and *Booker v. South Carolina Dep't of Corr.*, 583 F. App'x 43 (4th Cir., Aug. 28, 2014) (unpublished).  Both cases recognize that retaliation against an inmate for the exercise of his right to access the courts states a cognizable claim under the First Amendment. As noted in *McFadden*, "such retaliation by an official is actionable even if the act would

---

[5] In *Smith v. Berlin*, 2014 WL 4929468 (S.D. W. Va. Sept. 30, 2014), Chief Judge Chambers notes that a Proposed Findings and Recommendation (PF&R) submitted by United States Magistrate Judge Cheryl A. Eifert on August 28, 2014 was amended the following day, August 29, 2014, in light of the Fourth Circuit's decision in *Booker v. South Carolina Dept. of Corrections*, No. 13-2014 WL 4244253 (4th Cir. Aug. 28, 2014).  Judge Eifert's Amended PF&R recommended that Smith's First Amendment retaliation claim be permitted to proceed to trial in light of the decision in *Booker*.  Chief Judge Chambers adopted that finding and recommendation in his September 30, 2014.

have been proper if taken for different reasons." 517 F. App'x at 150 (citing *American Civil Liberties Union v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993).

However, to survive summary judgment, the plaintiff must allege "sufficient facts to warrant concern that the alleged retaliation might have a chilling effect on the exercise of the right to access the court and show that he suffered more than de minimus inconvenience" to the exercise of his First Amendment rights. *McFadden*, 517 F. App'x at 150; *Wicomico*, 999 F.2d at 785; *see also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). As clarified in *Booker*, whether or not the particular plaintiff's protected speech was curtailed, the district court must also evaluate whether the defendants' actions "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." 583 F. App'x at *44.

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff has failed to prove by any evidence other than his own conclusory allegations that he has been retaliated against for exercising his First Amendment right to access the courts and redress grievances. Even taking those allegations in the light most favorable to the plaintiff, he has not demonstrated that the defendants' conduct actually had any chilling effect on his ability to seek redress of his grievances, particularly by pursuing legal action in this or any other court[6] or that the defendants' conduct would likely deter a person of ordinary firmness from exercising those rights. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact and that the defendants are entitled to qualified immunity and judgment as a matter of law on the plaintiff's First Amendment retaliation claim.

---

[6] The undersigned notes that since the filing of this lawsuit, the plaintiff has been released on parole and is living in Wheeling, West Virginia.

**C.** **The plaintiff's claims against Captain Williams also fail as a matter of law.**

The plaintiff's factual allegations against Captain Williams appear to be limited to his role as a supervisor of defendants Patterson and Crook.  The Amended Complaint alleges that:

> 56.   Defendant Ronnie Williams is aware thru [sic; through] many grievances and complaints of the use of excessive force by officers working on the Quilliams unit.
>
> 57.   Captain Williams is blatantly aware of the fact that his subordinates do not follow the policy governing the use of force, however, does nothing to correct it.
>
> 58.   Captain Williams in fact encourages the placement of "Martial Law" and using pepper spray as punishment, for kicking doors and other misbehavior.

(ECF No. 35 at 15, ¶¶ 56-58).  The plaintiff's Amended Complaint further alleges that defendant Williams is "liable for [his] deliberate indifference by failing to investigate, by failing to adequately act, discipline and otherwise address and respond properly to the complaints, grievances and many pleas for help by the Plaintiff and other inmates housed in the Quilliams unit promoting and permitting malicious and sadistic physical and psychological torment and abuse."  (*Id.* at 20, ¶ 79).  Finally, the plaintiff's Amended Complaint asserts:

> The failure of Captain Ronnie Williams who is the Captain of the Quilliams units respectively to take disciplinary action to curb the well-known, well-documented and wide-spread pattern of excessive force, physical and psychological torment and abuse of inmates housed on the Quilliams units by officers assigned to the Quilliams units specifically Defendant Williams' subordinates, the forementioned actions so constitutes deliberate indifference/tacit authorization to the plaintiff's safety and contributed to and proximately caused the concerned constitutional violations of the 8th and the 1st Amendments of the U.S. Constitution and the tort of assault and battery under W. Va. state law.

(*Id.* at 25, ¶ 92).

26

The defendants' Memorandum of Law asserts that the plaintiff cannot demonstrate that Captain Williams was deliberately indifferent to a substantial risk of serious harm to the plaintiff. (ECF No. 79 at 14). The defendants' Memorandum of Law addresses this claim under the Fourth Circuit's decision in *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), in which the Court held that a supervisor may be liable for the actions of his subordinates where the supervisor, by his own conduct, was deliberately indifferent to, or tacitly authorized or approved, prior constitutional violations. Such liability is not based on *respondeat superior*, but rather upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." 13 F.3d at 798 (*quoting Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984)). (*Id.* at 14-16). The defendants' Memorandum asserts as follows:

> In the instant action, Plaintiff has alleged that Captain Williams failed to supervise any subordinate Correctional Officer; however, the Plaintiff has failed to point to a single use of force that was found to be excessive wherein no action was taken against the subject Correctional Officers. Essentially, the Plaintiff is relying on his own speculation, without any supporting facts, to assert these claims.
>
> Upon review of the incident reports filed in this case along with the grievance filed by Plaintiff, it is clear that not only does Captain Williams receive the grievances, but also passes the grievance on to the Warden. Captain Williams's subsequent report of the incident shows that Captain Williams reviewed the incident and came to an independent determination that the use of force was proper. [See ECF No. 78, Ex. H]. Captain Williams's review of the incident reports and grievances would not give him any reason to know or suspect that Officer Patterson or Officer Crook had used excessive force in the form of chemical agent, or that they would in the future. Because Plaintiff cannot demonstrate any knowledge by Captain Williams to meet the first element of the *Shaw* test, the Court need not proceed to the second or third elements. However, Plaintiff is unable to produce even a scintilla of evidence to support the second or third elements as well.

(*Id.* at 15-16).

The plaintiff's Response reiterates his contentions that defendant Williams, as the Segregation Commander, encouraged correctional officers working in his unit to use chemical agents as punishment for inmates kicking their doors and that he "enforced 'Martial Law.'"  (ECF No. 85 at 18).   However, the plaintiff has not produced any evidence to support these contentions.   The plaintiff's Response further asserts that defendant Williams was "negligent in his supervisory duties resulting in and proximately causing the retaliation by assault with chemical agents and the filing of false incident reports and violation reports."  (*Id.*)   Again, however, the plaintiff has not produced evidence to support his conclusory allegations.

At any rate, because the plaintiff has failed to prove that the use of force against him on July 31, 2015 was excessive, or that the plaintiff's First Amendment rights were violated by the conduct of defendants Patterson and Crook, his allegations against Captain Williams also fail as a matter of law.   Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact and that defendant Williams is entitled to qualified immunity and judgment as a matter of law on the plaintiff's claims against him.

### D.     The plaintiff's assault and battery claims fail as a matter of law.

The plaintiff's Amended Complaint contends that Officer Crook's "use of physical force against the plaintiff without need or provocation so constitutes the tort of assault and battery under the State Law of West Virginia."  (ECF No. 35 at 23, ¶ 86).   The plaintiff further appears to allege that the conduct of the other defendants permitted such unlawful assault to occur.

The defendants contend that the plaintiff's assault and battery claim fails as a matter of law because the defendants were privileged to use such force against the

plaintiff.  (ECF No. 79 at 16-17).  Their Memorandum of Law repeat their citation to the

*Williams* case in which the Fourth Circuit held that the use of chemical agents in small

quantities to "control a recalcitrant inmate" was generally considered a "mild" and

"tempered" response.  77 F.3d at 763.  (*Id.* at 16).  Their Memorandum further states:

> Here, Plaintiff admitted that he continually argued with Officer
> Patterson and Officer Crook and remained at the cell door, thus resulting
> in him being sprayed with two (2) one-second bursts of OC.  Further,
> Plaintiff's actions caused a disturbance within the unit.  The Defendants
> uses of OC against Plaintiff were measures to subdue an unruly and
> recalcitrant prisoner.  Due to Plaintiff's unruly and aggressive behavior,
> Defendants were privileged to spray Plaintiff with OC in order to obtain
> his compliance.  This does not constitute assault and battery.  Therefore,
> because Officer Patterson and Officer Crook were privileged to use OC
> spray against Plaintiff, the claims of assault and battery must fail as a
> matter of law.

(*Id.* at 16-17).

Conversely, the plaintiff asserts that he was not a threat to anyone at the time he

was locked behind a steel door and participating in an argument that defendant Crook

started when he was pepper sprayed.  The plaintiff further asserts that, because there

was there was no need for this use of force, defendant Crook committed an assault and

battery against him.  (ECF No. 85 at 19-20).  The defendants' Reply does not re-address

the assault and battery claim.

The plaintiff's claims of assault and battery are state law claims that are not

actionable under section 1983.  *See Gray v. Bd. of Cty. Commrs. Of Frederick Cty., Md*,

551 F. App'x 666, 677 (4th Cir. 2014) (a constitutional claim of excess  force and a state

tort claim of assault and battery are based on distinct legal concepts and foundations).

Under West Virginia law, the legal phrase "assault and battery" is used to refer to the

tort of battery.  *See Smith v. Berlin*, 2014 WL 4929468 *8 (S.D. W. Va. Sept. 30, 2014).

The *Smith* decision further enumerates the essential elements of a battery claim, as described in the Restatement (Second) of Torts, § 13 (1965) as follows:

> An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of another or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results.

*See also, Tolliver v. Kroger, Co.*, 498 S.E.2d 702, 710 (W. Va. 1997) (quoting Syl. Pt. 1, *Funeral Services by Gregory, Inc. v. Bluefield Cmty. Hosp.*, 413 S.E.2d. 79 (W. Va. 1991) ("In order to be liable for a battery, actor must act with the intention of causing a harmful or offensive contact with a person."), overruled on other grounds by *Courtney v. Courtney*, 437 S.E.2d 436 (W. Va. 1993).

Based upon the undersigned's prior proposed findings that the force used against the plaintiff was applied in a good faith effort to restore order, the undersigned further propose that the presiding District Judge **FIND** that the defendants were privileged to use such force and, therefore, as a matter of law, the plaintiff cannot demonstrate that the deployment of pepper spray was done with an intent by the defendants to cause a harmful or offensive contact with the plaintiff in order to successfully state a claim of assault and/or battery.

## **RECOMMENDATION**

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the defendants' Motion for Summary Judgment (ECF No. 78) and dismiss this matter from the docket of the court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge.  Pursuant to the provisions of Title 28, United States Code,

Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on Judge Johnston.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy to the plaintiff and to transmit a copy to counsel of record.


 July 30, 2015

Dwane L. Tinsley
United States Magistrate Judge


31